# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CR. 08-30052(02)-KES |
| | * | |
| Plaintiff, | * | |
| | * | REPORT AND RECOMMENDATION |
| -vs- | * | ON DEFENDANT'S MOTION |
| | * | TO SUPPRESS |
| EVER DAVID GRANADOS, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendant, Ever David Granados, has filed a Motion to Suppress and Memorandum in support thereof, Docket Nos. 39, 40. In his Motion, Defendant seeks to suppress all evidence obtained following the entry and search of his motel room and his father's vehicle on June 14, 2008, and all statements made by him to law enforcement agents later that same day. He also seeks to suppress the identification made of him by a confidential informant (CI) during a photographic lineup conducted on June 16, 2008. Plaintiff, United States of America (Government), has filed a Memorandum in opposition to the suppression Motion, Docket No. 41. This Court held a lengthy evidentiary hearing on Defendant's Motion at which four witnesses testified and ten exhibits were received into evidence. Because the Motion is a dispositive one, the Court is only authorized to determine the same on a report and recommendation basis. Pursuant to 28 U.S.C. §636(b)(1), the Court does now make and propose the following report and recommendation for disposition of the Motion.

I.

The facts providing the backdrop for Defendant's Motion will only be briefly stated at this point. Other relevant and more detailed facts will be recited in connection with the discussion of Defendant's claims and the legal issues involved with the same.

On June 14th, law enforcement agents listened to and observed their CI make a controlled delivery of $3,970 in cash to Gonzalo Morales in Pierre, South Dakota. Morales traveled to Pierre from out of state with Defendant in a green Ford Expedition, bearing New Mexico license plates, registered to Defendant's father, David Granados of Albuquerque, New Mexico. Upon arriving in Pierre, Defendant rented a motel room, number 250, at the Kelly Inn. Having listened to surveillance communication between the CI and Morales, it was clear to agents that the trip to Pierre was for the purpose of collecting on a drug debt.

After checking into the motel with Defendant, Morales agreed to meet with the CI in the Expedition parked outside the motel. Once inside the vehicle, the CI gave Morales $3,970 and told Morales that the remaining balance owed was coming and would be paid that night. Following a brief conversation about future drug dealings, Morales and the CI exited the vehicle and were both immediately apprehended by agents.

Once Morales was arrested, agents and local officers proceeded to room 250 of the motel. An odor of marijuana was readily apparent in the hallway outside the room. Without knocking or announcing themselves, agents and officers opened the door to the room, using a room card they had obtained from motel staff. Inside, they found Defendant on a bed and promptly handcuffed and arrested him. He was then taken outside the motel and placed in a patrol car.

Five minutes or so later, FBI Agent James Van Iten contacted Defendant and requested consent to search the motel room and the Expedition. Van Iten produced a consent to search form, containing descriptions of the places for which consent to search was sought, and Defendant put his initials next to the descriptions and signed the form. Both the motel room and Expedition were subsequently searched and various items were seized from the same.

Defendant was thereafter taken to the Hughes County Jail in Pierre. There, he was advised of and waived his <u>Miranda</u> rights and was interviewed by Van Iten and DCI Agent Jason Baldwin. Defendant, however, denied any knowledge of or involvement in Morales' drug activity.

On June 16th, Van Iten and Baldwin showed the CI a photographic lineup of six individuals, which included a photograph of Defendant. The CI had told agents that Morales' brother and someone else had previously delivered marijuana to the CI. After viewing the lineup, the CI indicated that the photograph of Defendant (Number:5) was someone who "could have been" with Morales' brother.

Defendant claims that the items seized from his motel room and the Expedition and the statements he made to agents were obtained in violation of his Fourth Amendment rights and must be suppressed under the Exclusionary Rule. He further claims that the identification procedure, utilized by agents in connection with the photographic lineup, was impermissibly suggestive and should be suppressed under the Fifth Amendment's Due Process Clause.

3

III.

The Court must first decide whether the warrantless entry into Defendant's motel room and arrest of him violated his Fourth Amendment rights. It is a well-established constitutional principle that absent consent or exigent circumstances, law enforcement officers may not enter a person's home without a warrant. Steagald v. United States, 451 U.S. 204, 211 (1981); Payton v. New York, 445 U.S. 573, 586 (1980). The same protection extends to a person's privacy in temporary dwelling places such as motel rooms. Hoffa v. United States, 385 U.S. 293, 301 (1966); Stoner v. California, 376 U.S. 483, 490 (1964); United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997).

Before police may enter a motel room and arrest a person without a warrant, there must be probable cause for the arrest and exigent circumstances present. United States v. Kelly, 329 F.3d 624, 628-29 (8th Cir. 2003); United States v. McConnell, 903 F.2d 566, 569-70 (8th Cir. 1990), cert. denied, 498 U.S. 1106 (1991); United States v. Davis, 785 F.2d 610, 615 (8th Cir. 1986). Probable cause exists when, at the time of the arrest, the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by another. Dunaway v. New York, 442 U.S. 200, 208, n. 9 (1979); Beck v. Ohio, 379 U.S. 89, 91 (1964); Kelly, 329 F.3d at 628. When making this determination, a reviewing court may consider the "collective knowledge and information of all of the officers involved." United States v. Marin-Cifuentes, 866 F.2d 988, 990 (8th Cir. 1989); United States v. Woolbright; 831 F.2d 1390, 1393 (8th Cir. 1987).

Exigent circumstances arise when the inevitable delay incident to obtaining a warrant must give way to the need for immediate action. McConnell, 903 F.2d at 569-70; United

4

States v. Padilla, 869 F.2d 372, 379-80 (8th Cir.), cert. denied, 492 U.S. 909 (1989).

Conditions under which exigent circumstances have been found include danger to police, the

public or the suspect himself and the risk of removal, destruction of evidence or flight.

McConnell, 903 F.2d at 569-70; Padilla, 869 F.2d at 379-80; Davis, 785 F.2d at 615; United

States v. Jones, 635 F.2d 1357, 1359-62 (8th Cir. 1980).

 Here, agents had probable cause to believe that Defendant, at the time of his arrest,

was involved in criminal activity with Morales. Such a determination is supported by the

following facts and circumstances.

1. The CI, who had been involved in the distribution of marijuana in central South Dakota and who was cooperating with drug task force agents, implicated Morales (who also went by the name of "Hector") as his source for the marijuana. As part of his cooperation, the CI agreed to participate in a controlled delivery of $3,970 to Morales at a meeting that was scheduled for June 14th. The CI would be wired and agents would be monitoring the CI's communications with Morales and conducting surveillance of the meeting area.

2. In a pre-arrest debriefing, agents and assisting officers were advised that Morales and another individual, both Mexican Nationals, were traveling to the Pierre area from out of state, that they were possibly armed and that they were dealing drugs. Agents and officers were also told that Morales had previously been known to have weapons (firearms and a knife) and that he had made a prior visit to the CI's family looking for the CI and for money that he owed to Morales.

3. In response to prior "collection" text messages that he had received from Morales, the CI called Morales while Morales was en route to Pierre from Murdo, South Dakota. Agents listened in on the telephone conversation and recorded the same. During the conversation, Morales used the word "we" several times, requesting first that the CI get a room so that "we" had a place to wait for the CI, then saying that it would be better if "we" got a room before ultimately telling the CI that "we" would get the room. Morales also talked about drug dealings with the CI, mentioned Morales' brother and discussed receiving payment for marijuana Morales had earlier provided to the CI.

4.     A short time later, DCI Agent Guy DiBenedetto and Pierre Police Detective Troy Swenson observed a green Ford Expedition with New Mexico license plates on it just south of Fort Pierre, South Dakota, traveling north on U.S. Highway 83 toward Pierre. DiBenedetto saw two dark haired/skinned individuals, of Hispanic origin, in the front seat of the Expedition. Swenson, in the meantime, ran a license plate check on the vehicle, which showed the registered owner to be David Granados of Albuquerque. DiBenedetto and Swenson followed the Expedition to the Kelly Inn, a motel located in the west end of Pierre.

5.     Following this, Morales advised the CI by telephone (in another tape recorded conversation) that Morales had arrived in Pierre and was staying in room 250 of the Kelly Inn. When asked about payment, the CI offered to bring some money to Morales in 20 minutes.

6.     Room 250 was registered to and paid for by Defendant. On the motel registration card he filled out, Defendant provided an Albuquerque address. Because the last names, residence addresses and license numbers on the motel and vehicle registrations were the same, Defendant was believed to be the one who rented the room and who owned the Expedition.

7.     Morales thereafter directed the CI to meet Morales in front of the motel at the same Expedition that had been seen less than 30 minutes earlier with two Hispanics in it.

8.     Shortly after 6:00 p.m., Morales and the CI got into the Expedition. The CI gave Morales $3,970 in cash and apologized because some of the bills were in small denominations. In response, Morales indicated that "we" take anything, "even 1's." Morales also asked the CI for rubber bands to separate the bills out. Morales inquired about the rest of the marijuana debt and was told that "the other guy [would] be bringing it" later that night. In his conversation with the CI, Morales talked about being in New Mexico and "getting back to Albuquerque," and discussed other matters, including his desire to find a place in Minneapolis, Minnesota, his intention to try and bring 50 pounds of marijuana next time and then 80 pounds, him looking for more people in Minnesota and North Dakota, and his wanting to expand his marijuana distribution enterprise.

9.     When the two exited the vehicle, Morales was immediately arrested and the CI was taken away to a secure location. At this time, the decision

was made to enter room 250 to arrest the individual who Morales had traveled to Pierre with and who was believed to be still in the room.

10.   Before entering room 250 and while Morales was with the CI, agents and officers smelled a very strong odor of burnt marijuana in front of the room.

From these facts and circumstances, a reasonably prudent task force agent would have believed that Defendant was involved, as a co-conspirator, confederate and/or aider and abettor, in illegal drug activity with Morales. Defendant transported or at least rode with Morales, in a vehicle Defendant was believed to be the owner of, for the purpose of collecting a drug debt. In addition, Defendant rented a room for Morales and allowed Morales to use Defendant's vehicle to meet with and obtain money from a drug dealer. Moreover, Defendant was present and had knowledge of one or more telephone conversations between Morales and the CI that involved discussions about ongoing marijuana activity and the collection of money for the same and did nothing to thwart, or divorce himself from, the situation. Finally, Morales' references to "we" in conversations with the CI together with the acrid odor of marijuana that emanated just outside of the motel room Defendant shared with Morales indicated, or at least suggested, that Defendant was a participant in Morales' marijuana distribution operation and that Defendant was a user of marijuana himself.

Having determined that probable cause existed to arrest Defendant does not end the inquiry. Indeed, the warrantless entry and arrest of Defendant must also be justified by exigent circumstances.

The Eighth Circuit has recognized "that the timing of undercover drug transactions make the simultaneous arrest of all conspirators a matter of special urgency." Padilla, 869 F.2d at 379-80; Marin-Cifuentes, 866 F.2d at 992; United States v. Kulcsar, 586 F.2d 1283, 1287 (8th Cir. 1978). In upholding the "special urgency" of such a situation, the appeals court has emphasized that one conspirator's failure to return with the proceeds of a drug transaction created significant risks and the resulting exigency necessary for a warrantless entry and arrest. Id.; see also United States v. Knobeloch, 746 F.2d 1366, 1367 (8th Cir. 1984) (fear of destruction of evidence was sufficient to constitute exigent circumstances justifying police officer forcing motel door open, arresting the defendant and seizing drugs from his person), cert. denied, 470 U.S. 1006 (1985); United States v. Palumbo, 735 F.2d 1095, 1097 (8th Cir.) (exigent circumstances to enter a hotel room when the arrest of a single defendant outside of the room would have alerted a second defendant who was in the room with the evidence), cert. denied, 469 U.S. 934 (1984); United States v. Wentz, 686 F.2d 653 (8th Cir. 1982) (exigent circumstances existed upon arrest of co-defendant and his failure to return to source with money).

Aside from this, the fact that the offense involved (trafficking large amounts of marijuana) was a serious one, that an associate of Morales was in the motel room possibly with access to weapons, that the identity of the CI and his family were known, that there were persons in and outside the motel who were in danger of being harmed (including Defendant himself), that a pungent burning odor or marijuana was present in the hallway just outside the motel room, and that there was a risk of removal, destruction of evidence and flight, provided an additional basis for the taking of immediate action. Id; McConnell, 903 F.2d at

8

569-70; <u>Davis</u>, 785 F.2d at 615; <u>Jones</u>, 635 F.2d at 1359-62; <u>see</u> <u>generally</u> 3 W. LaFave, <u>Search and Seizure</u>, §6.1(f) (4th ed. 2004).

There being probable cause and exigent circumstances, the warrantless entry into Defendant's motel room and arrest of him did not violate his Fourth Amendment right against unreasonable searches and seizures.[1]

IV.

The Court must next determine whether Defendant validly consented to the search and seizure of items from the motel room and from the Ford Expedition. This question is one that requires a broad factual inquiry and consideration of a number of factors.

Under the Fourth Amendment, warrantless searches are presumptively unreasonable, subject to a few recognized exceptions. <u>United States v. Sanders</u>, 424 F.3d 768, 773 (8th Cir. 2005). Consent is one such exception if the consent is voluntary.

Consent is voluntary when, based on the totality of the circumstances present, it is given without coercion, express or implied. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973); <u>Laing v. United States</u>, 891 F.2d 683, 686 (8th Cir. 1989). The Government bears the burden of showing, by a preponderance of the evidence, that a reasonable person would have believed that the consent alleged to have been given was the product of an "essentially free and unrestrained choice," and not "the result of duress or coercion," based on the "totality of all the circumstances." <u>United States v. Willie</u>, 462 F.3d 892, 896 (8th Cir. 2006) (quoting

---

[1]Nor did the agents' unannounced entry with a motel card key violate the statutory obligation imposed on them to give "notice of [their] authority and purpose" under 18 U.S.C. §3109. The exigent circumstances exception to the warrant requirement applies equally to statutes like §3109 because this exception existed at common law, of which the statute is a codification. <u>Padilla</u>, 869 F.2d at 380, n.4.

9

Schneckloth, 412 U.S. at 225, 227, 248), cert. denied, ___ U.S. ___, 127 S.Ct. 1847 (2007).

Eighth Circuit case law provides a catalog of factors for a court to consider in determining the voluntariness of a defendant's consent to search. Some of the factors relate to the characteristics and behavior of the defendant, such as his age, intelligence, education, and knowledge of his constitutional rights (whether from prior or contemporaneous Miranda warnings or from previous contacts with police), whether he was under the influence of alcohol or drugs, and whether he objected to the search or stood silently by when it occurred. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Others relate to the environment at the time the defendant allegedly gave consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. Id. Still others relate to the interaction between police and the defendant during the encounter, such as whether he was detained and questioned for a long time before consent was given, whether police threatened, physically intimidated or punished him, and whether he relied on promises or misrepresentations made by police in giving his consent. Id. No one factor is dispositive; instead, they are tools for the court to use in analyzing the totality of the circumstances. See Schneckloth, 412 U.S. at 227.

While some of these factors weigh against voluntariness, the Court is nonetheless satisfied that Defendant's will was not overborne and his capacity for self-determination was not critically impaired so that his consent to the search of his motel room and the Expedition was involuntary. See United States v. Watson, 423 U.S. 411, 424 (1976). Defendant was 29 years old at the time of his arrest. Although he dropped out of school in Mexico in the ninth grade, he was able to read, write and understand the English language. In fact, he

10

conversed in English and pointed out an error that had been made in the spelling of his first name on the consent form. He was cooperative, responded to inquiries made of him, and had no questions before or after signing the form.

While it is true that Defendant had not been given any <u>Miranda</u> warnings before he consented to the search, this fact – like the other factors earlier discussed – is not determinative of the question of voluntariness. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 246, 249; <u>see also</u> <u>United States v. Lee</u>, 356 F.3d 831, 834 (8th Cir. 2003) ("<u>Miranda</u> warnings . . . are not required for consent to a search to be voluntary, although they can lessen the probability that a defendant was subtly coerced."), <u>cert</u>. <u>denied</u>, 541 U.S. 1092 (2004). Even without the warnings, there is evidence that Defendant was aware of his constitutional rights. He signed a consent form that stated (1) he was voluntarily giving permission to search his motel room and the Ford Expedition and (2) he had been advised of his right to refuse consent. Before signing the form, he corrected the misspelling of his first name and initialed the two places sought to be searched. A forceful inference from these facts can be drawn that Defendant understood both the consequences of giving consent and his right to refuse it.

No threats, intimidation or punishment were used on Defendant and no promises or misrepresentations were made to procure consent from him. In short, the environment was not one that would give rise to a presumption of involuntary choice. Granted, Defendant was under arrest and handcuffed at the time he gave his consent. But, he had not been subjected to extended questioning and had only been under arrest for a very short time. In addition, he was in a public place (a motel parking lot) when he gave his consent. <u>See</u> <u>Watson</u>, 423 U.S. at 424 (finding valid consent despite a defendant's arrest when the consent was given in a

11

public setting and there was no evidence of coercive police tactics). The totality of the circumstances do not suggest that Defendant's consent, given both orally and in writing, was anything other than a free choice, and the Court so finds and concludes.

V.

The Court must also decide whether the statements Defendant made to Van Iten and Baldwin on June 14th, following the search of Defendant's motel room and the Ford Expedition, should be suppressed under the Fourth Amendment's Exclusionary Rule. [2] Because probable cause and exigent circumstances existed for the entry and arrest of him in the motel room and because the searches of his room and the Expedition were consentual, Defendant's subsequent statements were not "tainted" by or the "poisonous fruit" of the entry, arrest and searches so as to violate the Fourth Amendment and require suppression of the statements at trial.

Even assuming, arguendo, that Defendant's warrantless arrest was illegal and not in compliance with the dictates of Payton (because exigent circumstances did not exist), the Government is nonetheless still not barred by the Exclusionary Rule from using his statements as substantive evidence at trial. New York v. Harris, 495 U.S. 14, 21 (1990); United States v. Duchi, 944 F.2d 391, 395 (8th Cir. 1991). The Supreme Court in Harris held that Brown v. Illinois, 422 U.S. 590 (1975) was distinguishable because the incriminating statements in that case were taken after an arrest without probable cause. 495 U.S. at 18-19. As a result, the defendant's statements were "not the product of being in

---

[2]It should be noted that Defendant seeks to suppress his post-arrest statements based on alleged violations of the Fourth, but not the Fifth, Amendment.

12

unlawful custody." Id. at 19.  In contrast, the defendant in Harris was not illegally held when he was removed to the station house, given Miranda warnings and allowed to talk.  Id. at 18. According to the Harris Court, inasmuch as the police had a basis for questioning the defendant prior to his arrest, his subsequent statement was not an exploitation of the illegal entry into his home that required exclusion.  Id. at 19.

Harris thus makes clear that for statements to be considered the fruit of an illegal search, they must be directly or indirectly attributable to the constitutional violation.  In Harris, even though the illegal arrest was a "but for" cause of the later statement (in that without the illegal arrest no statement would have been made), the arrest was not the proximate cause of the statement because the statement was not obtained during the unconstitutional entry into the defendant's home.

The same is true in this case.  Agents had probable cause to arrest Defendant for a drug offense and did not "exploit" any alleged illegality, with respect to the entry into the motel room, to obtain Defendant's statements as was the case in Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).  Instead, after being Mirandized and waiving his rights, Defendant chose to talk to agents and answer questions posed to him.

Regardless, Defendant's statements are, at a minimum, admissible at trial for impeachment purposes when and if he testifies.   Oregon v. Hass, 420 U.S. 714, 720-24 (1975); Harris v. New York, 401 U.S. 222, 223-26 (1971); see also United States v. Havens, 446 U.S. 620, 624-28 (1980) (holding that the rationale of Hass and Harris permit the use of illegally obtained evidence to impeach statements made by the defendant on cross-examination).  Defendant's statements were made voluntarily and were not the product of

coercion, express or implied.[3]  See and compare Mincey v. Arizona, 437 U.S. 385, 397-402 (1978).

VI.

The final question the Court must pass on is whether the photographic lineup, from which the CI identified Defendant, violated Defendant's due process rights under the Fifth Amendment.  The Court finds and concludes that it did not.

A pre-trial photographic identification or "array" may implicate a defendant's due process rights and its admissibility is reviewed using a two-step inquiry.  Manson v. Brathwaite, 432 U.S. 98, 114 (1977); United States v. Donelson, 450 F.3d 768, 772 (8th Cir.), cert. denied, _____ U.S. ____, 127 S.Ct. 451 (2006).  The first step is to determine whether the lineup or array was "impermissibly suggestive." United States v. Boston, 494 F.3d 660, 666 (8th Cir. 2007) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968));

---

[3]A statement is involuntary when it is extracted by threats, violence or express or implied promises sufficient to overbear a suspect's will and critically impair his capacity for self-determination.  United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc), cert. denied, 543 U.S. 1145 (2005); United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005).  Whether the suspect's will has been overborne is determined by examining the totality of the circumstances, including both the conduct of the officers in exerting pressure on the suspect and the suspect's ability to resist that pressure.  Id.

After reviewing the record and assessing the credibility of the witnesses who testified, the Court is unable to find that the requisite coercive or overreaching conduct was present on June 14th so as to make Defendant's statements to Van Iten and Baldwin involuntary.  No threats or promises were made to Defendant and no undue influence or pressure was exerted on him.  He answered questions asked of him without hesitation, including ones inquiring about his alien status, what his phone numbers were, whether he was married and where he had been earlier that day.  He also proclaimed that he was not involved in any drug activity and had merely given Morales a ride.  He said that he was willing to take a polygraph examination and would pass the same.  At no time did he ever invoke any of his rights or admit that he had any knowledge of why he and Morales came to Pierre.  There can be little doubt that Defendant's statements were voluntary and not the product of coercive action that undermined his ability to exercise his free will and make decisions for himself.  See United States v. Plumman, 409 U.S. 919, 924-25 (8th Cir. 2005); United States v. Bordeaux, 400 F.3d 548, 560-61 (8th Cir. 2005).

14

United States v. Martin, 391 F.3d 949, 952 (8th Cir. 2005). If such a finding is made, the second step is to determine whether, under the totality of the circumstances, the lineup or array created a "very substantial likelihood of irreparable misidentification." Id.; Donelson, 450 F.3d at 773.

The photographic lineup or array presented to the CI here contained pictures of six individuals with similar characteristics and no other identifying information. See Manson, 432 U.S. at 117 (other individuals in photo spreads should ideally resemble the suspect). Baldwin asked the CI if anyone had ever delivered marijuana or money to any of the individuals depicted in the photographs. The CI said no, that he had never received money or marijuana, but added that one of the individuals "could have been there when [he] gave it to [Morales'] brother." The CI then identified the individual found in Photo Number:5 as the person who "could've" been present, but made no comments about any of the other individuals in the lineup.

Challenges to six-person photographic lineups, like the one used in this case, as being impermissibly suggestive, have consistently been rejected by the Eighth Circuit. See e.g. Boston, 494 F.3d at 666; Schawitsch v. Burt, 491 F.3d 798, 800, 803 (8th Cir. 2007); Donelson, 450 F.3d at 773. The Court has reviewed the lineup shown to the CI and finds that there are no differences in appearance which tend to isolate Defendant's photograph. Schawitsch, 491 F.3d at 802; United States v. Mays, 822 F.2d 793, 798 (8th Cir. 1987). Moreover, there is no evidence that Van Iten or Baldwin said or did anything to influence the CI during the lineup and there is no requirement that such a lineup be administered by officers who are independent from the investigation. Boston, 494 F.3d at 666. Accordingly,

the lineup used by agents was not unduly suggestive, and as such, there is no need to proceed to the second step of the inquiry and determine whether the CI's equivocal identification is reliable. Boston, 494 F.3d at 666; United States v. Daily, 488 F.3d 796, 804 (8th Cir. 2007).

VII.

For the reasons stated herein, the Court hereby recommends that Defendant's Motion to Suppress, filed at Docket No. 39, be denied in all respects.

Dated this 19th day of September, 2008, at Pierre, South Dakota.

**BY THE COURT:**

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**

**ATTEST:**
**JOSEPH HAAS, CLERK**
**BY:** _Jeanette Morris_
**Deputy**
**(SEAL)**

NOTICE

**Failure to file written objections to the within and foregoing Report and Recommendation for disposition within ten (10) days from the date of service shall bar an aggrieved party from attacking such Report and Recommendations before the assigned United States District Judge. See 28 U.S.C. § 636(b)(1).**